STATE OF NORTH CAROLINA v. JAMES WILLIAM JEFFERIES

No. 396A91

(Filed 8 April 1993)

**1. Grand Jury § 10 (NCI4th) — murder — selection of grand jury foreman — prima facie racial discrimination**

The trial court did not err in a murder prosecution by holding that defendant had made a *prima facie* case of racial discrimination in the selection of grand jury foremen where defendant offered certified documents listing all grand jury members and foremen for the previous nineteen years and a witness testified that he had examined the documents and was able to determine that 83 foremen had been selected during that time, he was able to identify the race of 78 of the foremen, and 3.8 percent were black while 19.73 percent of the members of the grand jury were black. The State's argument that the documents were not sufficiently authenticated and that the witness made invalid assumptions went to the weight of the evidence.

**Am Jur 2d, Jury §§ 173, 184, 185.**

**2. Grand Jury § 10 (NCI4th) — murder — selection of grand jury foreman — prima facie racial discrimination — rebuttal**

The trial court did not err in a murder and assault prosecution by holding that the State successfully rebutted the defendant's *prima facie* case of racial discrimination in the selection of the foremen of the two grand juries which indicted

him where the case was governed by *Cofield I*, 320 N.C. 297, but not *Cofield II*; the judge who appointed the foreman of the grand jury which returned the murder indictment testified that he did not remember appointing the foreman but would have followed a procedure outlined in a grand jury manual for Mecklenburg County, pursuant to which he would have followed the recommendation of the sitting grand jury at the end of its term as to the appointment of the foreman of the next grand jury; the foreman of the previous grand jury testified that he recommended a member of his grand jury for appoint-ment as foreman of the next grand jury following talks with other people on the grand jury as to the diligence or earnestness with which members were serving on the grand jury, that these discussions were about both black and white members of the grand jury, and that the only qualification discussed was diligence or earnestness as to the performance of the job that had to be done; and the foreman of the grand jury which returned the felonious assault indictment testified that the foreman of the grand jury in the previous term had told him that it would be necessary to select a foreman for the next term, that the alternate foreman presided at the last meeting of that grand jury, at which most of the members were present, that the alternate foreman reminded them that they had to select someone to recommend and asked if anyone would volunteer, said again that they needed to come up with someone when there were no volunteers, and the person who was to serve then volunteered.

Am Jur 2d, Jury §§ 173, 184, 185, 186.

3. **Evidence and Witnesses § 1070 (NCI4th) — assault and murder — flight — instruction — evidence sufficient**

The trial court did not err in a murder prosecution by giving the pattern jury instruction on flight where the State's evidence showed that defendant came to Charlotte the day before the murder; defendant and Robinson went to the vic-tim's apartment late one night; they induced the murder victim to leave with them under the pretense of "getting the money"; they attempted to kill a potential witness; they put the murder victim's body in a remote area and abandoned the automobile; they convinced a friend to drive them to Richmond the morn-ing after the murder; defendant stayed in Richmond and was not apprehended for two years; and Robinson returned to

Charlotte the next day and retained an attorney. Defendant took steps after the killing to avoid detection and apprehension and flight was a part of this effort. Although defendant argued that commenting on evidence of flight gives unfair emphasis to that evidence and that the charge did not instruct the jury as to how it must consider evidence of flight, the Supreme Court declined to change the rule as to instructions on flight and the Pattern Jury Instruction given was a correct statement of the law.

**Am Jur 2d, Evidence §§ 280 et seq.; Trial §§ 1164, 1168, 1333, 1334.**

4. **Evidence and Witnesses § 775 (NCI4th) — murder and assault — disposition of charges against codefendant — excluded — no prejudicial error**

There was no prejudicial error in a murder and assault prosecution where one of the State's theories was that defendant and George Robinson acted in concert to commit the two crimes, a detective testified that Robinson was arrested for the two charges, and the court would not let defendant elicit on cross-examination of the detective that the charges against Robinson had been dismissed and excluded from evidence documents from the clerk's office showing that the charges had been dismissed. Although it was error to exclude the evidence, evidence as to the disposition of a co-defendant's case is peripheral to the question of the defendant's guilt. It would not have affected the outcome of the trial.

**Am Jur 2d, Appeal and Error §§ 797, 798, 802, 803; Evidence §§ 320, 321.**

5. **Criminal Law § 794 (NCI4th) — murder and assault — instructions — acting in concert — evidence sufficient**

The evidence in a murder and assault prosecution supports the submission to the jury of acting in concert with George Robinson where Robinson was at the scene, the meeting between the men was on account of a debt Robinson owed to one victim, Robinson drove the four men in his automobile, and Robinson said, after the two men were shot, "[d]amn, I didn't mean for you to do this in my car." The jury could find from this evidence that Robinson was at the scene acting

together with defendant to kill one victim and feloniously assault the other.

**Am Jur 2d, Evidence § 227.**

6. **Criminal Law § 1101.1 (NCI4th)— assault—nonstatutory aggravating factor—elimination of witness**

The trial court did not err when sentencing defendant for felonious assault by finding as a nonstatutory aggravating factor that defendant's motive in shooting the victim, Surginer, was to eliminate him as a witness where the court could have concluded that McClam was the person the defendant and Robinson intended to kill, Surginer went with them only because McClam asked him to do so, the defendant had no reason to kill Surginer other than to prevent Surginer from inculpating defendant in the crime, and defendant and Robinson continued to search for Surginer in order to kill him after he escaped from the car.

**Am Jur 2d, Assault and Battery §§ 48, 49.**

Justice PARKER did not participate in the consideration or decision of this case.

Justice MITCHELL dissenting.

Justice FRYE concurring in part and dissenting in part.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment for first degree murder entered by Saunders, J., at the 9 July 1990 regular Criminal Session of Superior Court, Mecklenburg County, upon a jury verdict of guilty of first degree murder. The defendant's motion to bypass the Court of Appeals as to an additional judgment was allowed by the Supreme Court 28 January 1992. Heard in the Supreme Court 6 October 1992.

The defendant was tried for his life upon a bill of indictment charging him with the first degree murder of Anthony Scott McClam. He was also tried for assault with a deadly weapon with intent to kill inflicting serious injury upon Darrell Leon Surginer.

The State's evidence tended to show that George Robinson was indebted to Anthony Scott McClam, the murder victim, for a drug purchase. The defendant accompanied Robinson to McClam's

apartment on the night of 28 October 1986 around midnight. The three men discussed the debt and decided to go to Robinson's house to get the money. McClam told Darrell Leon Surginer, his roommate, that they were going to the store and asked him to accompany them. All four of the men left the apartment in Robinson's car. Robinson was driving, the defendant was in the front passenger seat, McClam was in the back seat behind the defendant, and Surginer was in the back seat behind Robinson. They proceeded past the local convenience store which was closed. Surginer became suspicious and asked McClam, "[w]hat's up?" McClam responded that they were going to Robinson's house to get the rest of his money. They reached Robinson's apartment, at which time Robinson went inside, but returned saying his money had not yet arrived. The defendant said, "[i]f you take me by my aunt and uncle's house, I'll give you the money . . . ."

Robinson drove for awhile and appeared to be unsure of where he was going. McClam said to the defendant, "[y]ou sure act like you don't know where your aunt or uncle live." The defendant said, "[w]hat? What?," then, without warning, shot McClam twice in the face with a pistol. The defendant then shot Surginer twice. Robinson turned off the headlights and accelerated the automobile, saying, "[d]amn, I didn't mean for you to do this in my car." In fear for his life, Surginer jumped from the moving car and heard two more gunshots. He hid near some houses. Robinson stopped the car, turned around, and drove back down the street slowly, looking for Surginer. When the car left the area, Surginer was able to get a nearby resident to call the police. Robinson and the defendant dumped McClam's body in a nearby wooded area and abandoned the car.

On 29 October 1986, Robinson and the defendant had a friend drive them from Charlotte, North Carolina to Richmond, Virginia. In Richmond, the defendant left the car at an apartment complex. Robinson went to his grandmother's house with his friend where they spent the night. Robinson and his friend returned to Charlotte on 30 October 1986 and each consulted an attorney. The defendant was arrested two years later, on 11 October 1988.

At trial, the defendant was convicted of first degree murder and felonious assault. The jury recommended that the defendant be sentenced to life in prison and this sentence was imposed. The

court imposed a sentence of ten years on the felonious assault conviction.

*Lacy H. Thornburg, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant appellant.*

WEBB, Justice.

[1] In his first assignment of error, the defendant, a black male, contends it was error not to dismiss the two indictments against him because the foremen of the two separate grand juries which indicted him were not selected in a racially neutral manner. The defendant made a motion to dismiss the indictments before pleading to them. In *State v. Cofield,* 320 N.C. 297, 357 S.E.2d 622 (1987) (*Cofield I*), we held that a minority defendant, by showing that the selection process was not racially neutral or that for a substantial period in the past relatively few blacks have served as foreman on grand juries, although a substantial number have served on grand juries, may establish a *prima facie* case of racial discrimination in the selection of the foreman of a grand jury requiring that the indictment be dismissed unless the State can rebut the *prima facie* case by showing that the foreman was chosen in a racially neutral manner. In *State v. Cofield,* 324 N.C. 452, 379 S.E.2d 834 (1989) (*Cofield II*), we held that a process for the selection of a grand jury foreman could not be racially neutral unless it operates so that all members of the jury are considered. This rule operates prospectively and does not apply in this case because the order overruling the defendant's motion was made before *Cofield II* was decided. A hearing on the defendant's motion was held prior to trial by Judge Hollis M. Owens, Jr.

In order to make a *prima facie* case of discrimination, the defendant relied on the second method prescribed by *Cofield I.* He offered evidence that for a substantial period in the past relatively few blacks had served as foreman of a grand jury in Mecklenburg County, although a substantial number have served on grand juries. This evidence consisted of certified documents listing all grand jury members and foremen for the previous nineteen years. He then offered two witnesses, one of whom testified that he had examined the documents and was able to determine that 83 foremen

had been selected during that time. He testified further that he was able to identify the race of 78 of the foremen. He testified that 3.8 percent of these foremen were black while 19.73 percent of the members of the grand jury were black. The court found facts consistent with this evidence and concluded the defendant had established a *prima facie* case of discrimination in the selection of the grand jury foremen.

The State argues that documents on which the witness based his testimony were not sufficiently authenticated to be reliable. The State also contends that the witness made certain assumptions which were not valid in reaching his conclusions in regard to the composition of the grand juries and the race of the foremen for them. The State's argument goes to the weight of the evidence. We might have found different facts but the findings of fact by the superior court were supported by sufficient evidence and we are bound by them. *State v. Corley*, 310 N.C. 40, 311 S.E.2d 540 (1984). It was not error for the court to hold that the defendant had made a *prima facie* case of racial discrimination in the selection of the foremen of the grand juries.

[2] We next face the question of whether the superior court committed error in holding that the State successfully rebutted the defendant's *prima facie* case of racial discrimination. We hold that the court did not commit error.

The defendant was tried on two separate indictments. One of them charged him with murder and the other charged him with a felonious assault. Judge Chase B. Saunders appointed the foreman of the grand jury that returned the murder indictment. He testified that he did not remember appointing the foreman, but he would have followed a procedure outlined in a grand jury manual for Mecklenburg County. Pursuant to this procedure, he would have followed the recommendation of the sitting grand jury at the end of its term as to the appointment of the foreman of the next grand jury. He testified, "it appeared to me that the jurors, by making that recommendation, were satisfied as to the leadership qualities of that individual and that that individual had a level of experience in conducting the proceedings which would be beneficial to the administration of justice in that hearing process."

The foreman of the grand jury, which sat immediately prior to the grand jury which returned the murder indictment, testified that he recommended a member of his grand jury to Judge Saunders

for appointment as foreman of the next grand jury. Prior to making this recommendation, he talked to other people on the grand jury "as to the diligence or earnestness with which members were serving on the grand jury[.]" These discussions were about other members of the grand jury both black and white. He testified that the only qualification that was discussed was diligence or earnestness "[a]s to the performance of the job that had [to be] done[.]"

The court made findings of fact consistent with this testimony and held that the State had rebutted the defendant's *prima facie* case. In this we perceive no error. The essential requirement of *Cofield I* is that race must play no part in the selection of the foreman of a grand jury. This requirement is proved in this case by the testimony of Judge Saunders who appointed the foreman and the testimony of the foreman of the preceding grand jury. Their testimony was to the effect that their purpose in the selection process was to get the best possible person as foreman. They did not mention race in their testimony, but we can conclude from this testimony that their purpose was to select the best person for the job regardless of race. The State successfully rebutted the *prima facie* case of racial discrimination in the selection of the foreman of the grand jury which returned the indictment for murder.

The only evidence in regard to selection of the foreman of the grand jury that returned the indictment for felonious assault was the testimony of the foreman. He testified that near the end of the previous term, the foreman of the grand jury then sitting told him it would be necessary to select a foreman for the next term. At the last meeting of that grand jury, the foreman was absent and the alternate foreman presided. Most of the members were present. The alternate foreman reminded the grand jury that it had to select someone to recommend to the court to serve as grand jury foreman. He asked if anyone would volunteer to serve in this capacity. No one volunteered. The witness testified, "I would say a fair amount of time, twenty seconds or so passed, and he said, '[c]ome on. Somebody has got to do this. You know, we need to come up with somebody who is willing to serve and do this[.]' " The person who was to serve as the foreman of the next grand jury then volunteered.

We believe this testimony shows that the foreman of this grand jury was chosen in a racially neutral manner. Indeed, by

giving anyone who would volunteer to do so the opportunity to serve as foreman, it enabled any person who wanted to be foreman to have the job, including members of a minority. This was a racially neutral selection process. The defendant's first assignment of error is overruled.

[3] The defendant next assigns error to the court's instructing the jury as to flight. The court instructed the jury as follows:

> Now, the State contends that the Defendant fled. Evidence of flight may be considered by you, together with all other facts and circumstances in this case, in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the Defendants [sic] guilt. Further, this circumstance has no bearing on the question of whether the Defendant act[ed] with premeditation and delibera-tion. Therefore, it must not be considered by you as evidence of premeditation or deliberation.

The defendant argues that this instruction was not supported by the evidence and it did not correctly apply the law to the evidence. The defendant contends that in order to support an instruction on flight, the evidence must show not only that the defendant left the vicinity of the crime or fled from law enforcement officers, but that this behavior was a reaction to the crime charged. The defendant says that the evidence in this case raises no more than a suspicion that the defendant's behavior reflected a consciousness of guilt.

The defendant concedes that the cases in which we have upheld the giving of flight instructions have ranged so broadly that they "seemingly encompass almost every situation in which the accused fails to remain at the" scene of the crime. He says that some cases define flight as hiding from the police or resisting arrest. *State v. Belton*, 318 N.C. 141, 347 S.E.2d 755 (1986). He says some cases have defined flight to mean the defendant left or attempted to leave the state or the city in which the crime occurred. *State v. Green*, 321 N.C. 594, 365 S.E.2d 587, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988); *State v. Harris*, 289 N.C. 275, 221 S.E.2d 343 (1976). He says that other cases hold that flight has occurred when the officers are unable to locate the defendant at home or in places he might be expected to be found. *State v. Tucker*, 329

N.C. 709, 407 S.E.2d 805 (1991); *State v. Lampkins*, 283 N.C. 520, 196 S.E.2d 697 (1973).

The defendant also concedes that in *State v. Avery*, 299 N.C. 126, 261 S.E.2d 803 (1980), a case with facts similar to this case, we held that a charge on flight was properly submitted. In that case, the defendant, who was a resident of New York City, murdered a taxicab driver in Charlotte and returned to his home in New York two days later after telling two people that he had killed the driver.

We believe the evidence supports a finding by the jury that the defendant was in actual flight as opposed to mere departure when he left Charlotte and that his flight reflected a consciousness of guilt. This supports the instruction on flight. The State's evidence showed that the defendant came to Charlotte the day before the murder. He and Robinson went to McClam's apartment late on the night of 26 October 1986. They induced McClam to leave with them under the pretense of "getting the money." The evidence supports a finding that defendant and Robinson planned the murder. They attempted to kill Mr. Surginer in order to eliminate a potential witness. They also put Mr. McClam's body in a remote area and abandoned the automobile. On the morning after the murder, they convinced a friend to drive them to Richmond. The defendant stayed in Richmond and was not apprehended for two years. Robinson returned to Charlotte the next day and retained an attorney. This evidence shows the defendant took steps after the killing to avoid detection and apprehension. Flight was a part of this effort and a charge on this evidence was proper.

The defendant argues that we should reconsider the rules we have developed for the consideration of evidence of flight. He says that evidence of flight is simply evidence and that commenting on such evidence when we do not comment on other evidence, gives unfair emphasis to this evidence for the State. He cites cases from five jurisdictions which have abolished the flight instruction for this reason. The defendant calls attention to the fact that in this case the court elected not to recapitulate the evidence in its charge, which it may do pursuant to N.C.G.S. § 15A-1232, but by emphasizing one part of the State's evidence without recapitulating any of the defendant's evidence, the court expressed an opinion on the evidence in violation of this section. *State v.*

*Holden,* 280 N.C. 426, 185 S.E.2d 889 (1972). We decline to change our rule at this time as to instructions as to flight.

In addition to his argument that it was error to give an instruction on flight, the defendant contends that the instruction that was given was erroneous. He says that when a question of flight arises, the jury must determine whether the conduct found to have existed constituted flight rather than simple departure and if the jury finds there was a flight, whether the flight reflected a consciousness of guilt of the crime charged. He says the charge did not instruct the jury as to how it must consider evidence of flight and this was error.

The charge given was based on the Pattern Jury Instructions, N.C.P.I.—Crim. 104.36. Although it may not explain in detail how the evidence of flight should be considered by the jury, it is a correct statement of the law. *State v. Tucker,* 329 N.C. 709, 407 S.E.2d 805. It should aid the jury in its deliberation and it was not error to give it.

[4] The defendant next argues it was error to exclude certain evidence he offered in regard to the dismissal of the charges against George Robinson. One of the State's theories was that the defendant and George Robinson acted in concert to commit the two crimes. A detective testified that Robinson was arrested for the two charges. The court would not let the defendant elicit, on cross-examination of the detective, testimony that the charges against Robinson had been dismissed. The court also excluded from the evidence documents from the office of the Clerk of Superior Court showing that the charges against Robinson had been dismissed.

When a party introduces evidence favorable to its case, the other party has the right to introduce evidence to explain or rebut such evidence, although the latter evidence would be inadmissible had it been offered initially. *State v. Avery,* 315 N.C. 1, 337 S.E.2d 786 (1985); *State v. Brown,* 310 N.C. 563, 313 S.E.2d 585 (1984); *State v. Albert,* 303 N.C. 173, 277 S.E.2d 439 (1981). Assuming the evidence which the defendant attempted to introduce would have been inadmissible if offered originally, it became admissible when the State's witness testified on this subject. It was error to exclude this evidence.

The question we face is whether this was harmless error. The error involved a ruling on the evidence and does not implicate

a right arising under the federal or state Constitution. The test is whether there is a reasonable possibility that had the error not occurred, a different result would have been reached at the trial. N.C.G.S. § 15A-1443(a) (1988); *State v. Milby*, 302 N.C. 137, 273 S.E.2d 716 (1981). We are confident that applying this test, the error is harmless. Evidence as to the disposition of a co-defendant's case is peripheral to the question of the defendant's guilt. If this evidence had been admitted, it would not have impeached the testimony of the State's witnesses. We cannot hold the evidence would have affected the outcome of the trial. This assignment of error is overruled.

[5] The defendant next contends that it was error for the court to instruct on acting in concert. He says there was no evidence that he and George Robinson were acting in concert. A person may be found guilty of committing a crime if he is at the scene acting together with another person with a common plan to commit the crime, although the other person does all the acts necessary to commit the crime. *State v. Joyner*, 297 N.C. 349, 255 S.E.2d 390 (1979). We hold the evidence supports the submission to the jury of acting in concert with George Robinson.

Robinson was at the scene. The meeting between the men was on account of a debt Robinson owed to McClam. Robinson drove the four men in his automobile. After the two men were shot, Robinson said, "[d]amn, I didn't mean for you to do this in my car." From this evidence, the jury could find that Robinson was at the scene acting together with defendant to kill Mr. McClam and feloniously assault Mr. Surginer. This assignment of error is overruled.

[6] In his last assignment of error, the defendant contends it was error to enhance his sentence for assault based on the nonstatutory aggravating factor that the "motive in shooting Leon Surginer was to eliminate him as a witness." This nonstatutory aggravating factor is close kin to the statutory aggravating factor in N.C.G.S. § 15A-1340.4(a)(1)(b), which reads "[t]he offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." *State v. Green*, 321 N.C. 594, 365 S.E.2d 587, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988).

The defendant contends there was not sufficient evidence to support this aggravating factor. He says there must be more evidence than the shooting to support the finding of this aggravating factor.

There is such evidence in this case. The court could have concluded that McClam was the person the defendant and Robinson intended to kill. Surginer went with them only because McClam asked him to do so. The defendant had no reason to kill Surginer other than to prevent Surginer from inculpating defendant in the crime. When this evidence is coupled with the evidence that after Surginer escaped from the automobile the defendant and Robinson continued to search for him in order to kill him, it supports the finding of this aggravating factor.

NO ERROR.

Justice Parker did not participate in the consideration or decision of this case.

Justice MITCHELL dissenting.

In *State v. Cofield*, 324 N.C. 452, 379 S.E.2d 834 (1989) (*Cofield II*), a majority of this Court held that for the selection of a grand jury foreman to be racially neutral, all grand jurors must be "considered" by the presiding judge for selection as the foreman. I did not and do not find the reasoning of the majority in applying the "consideration" test when addressing the issue of racial neutrality in the selection of a grand jury foreman to be persuasive. Instead, it has been and is my view that "article I, section 26 [of the Constitution of North Carolina] assures that every grand juror will have an equal opportunity to serve as foreman — not that all grand jurors will be 'considered' for that position." *Id.* at 466, 379 S.E.2d at 842 (Mitchell, J., concurring in result).

For reasons discussed in my concurring opinion in *Cofield II*, I do not believe that in the present case either selecting one grand jury foreman by asking for volunteers, or selecting the other by permitting the outgoing grand jury foreman to select his successor on the basis of what he perceived to be that successor's qualifications, gave all grand jurors an equal opportunity to serve as foreman. *Id.* at 465-66, 379 S.E.2d at 841-42. Therefore, I would vacate the verdicts and judgments against this defendant and quash the indictments returned against him by the two grand juries. Certainly, if this were a case to which the prospective holding of *Cofield II* applied, it could not seriously be argued that the *presiding judge* "considered" all grand jurors as that case requires.

I recognize that, in determining the proper construction and interpretation of the Constitution of North Carolina, there is no higher authority than a majority of this Court. *State ex rel. Martin v. Preston,.* 325 N.C. 438, 385 S.E.2d 473 (1989). Accordingly, I do not intend to raise this issue again. However, I feel compelled to remind the majority one last time that—as demonstrated by this case—the "consideration" requirement it has adopted is of little practical value in determining whether the members of any group have been denied the right to an equal opportunity to serve as foreman of a grand jury.

For the foregoing reasons, I dissent.

Justice FRYE concurring in part, dissenting in part.

As stated by the Court, the rule of *State v. Cofield*, 324 N.C. 452, 379 S.E.2d 834 (1989) (*Cofield II*), operates prospectively and does not apply in this case because the order overruling defendant's motion was made before *Cofield II* was decided. More specifically, our holding in *Cofield II* "that, in meeting the racially neutral standard for selecting the foreman of the grand jury, the trial judge must consider all the grand jurors, . . . will apply only to . . . cases in which the indicting grand jury's foreman is selected after the certification date of [*Cofield II*]." *Id.* at 461, 379 S.E.2d at 839. Thus, it is unnecessary for us to decide whether the selection procedures used in this case "insure[d] that all grand jurors [were] considered by the presiding judge for his selection . . . ." *Id.* Rather, we must decide whether the selection process here was racially neutral under *State v. Cofield*, 320 N.C. 297, 357 S.E.2d 622 (1987) (*Cofield I*). Since defendant has shown a *prima facie* case of racial discrimination in the selection of the forepersons of the grand juries which indicted him, we must determine whether the State rebutted the *prima facie* case by showing that the forepersons were chosen in a racially neutral manner. *Id. See also State v. Moore*, 329 N.C. 245, 404 S.E.2d 845 (1992).

With reference to the selection of the foreman of the grand jury that returned the indictment for felonious assault, I concur in the result reached by the Court. However, I dissent from the result reached by the Court with reference to the selection of the foreman of the grand jury that returned the indictment for murder. The combined testimony of the judge and previous grand jury foreman shows rather clearly that the judge essentially ac-

cepted the subjective judgment of the foreman of the previous grand jury as to who should be appointed as the current foreman. This was essentially the same procedure that had been followed in the past, giving rise to a statistical pattern of underrepresentation of Blacks sufficient to create a *prima facie* case of racial discrimination. This testimony is simply insufficient to show that the process used in this case was racially neutral so as to rebut the *prima facie* case of racial discrimination in the selection of the grand jury foreman. *See State v. Cofield*, 320 N.C. 297, 357 S.E.2d 622 (*Cofield I*).